ARCHIBALD W. RIDINGS, Respondent, *v.* WILLIAM HALL *et al.*, Appellants.

1. *Pacific Railroad — County subscription — Ownership of stock.*— By the act incorporating the Pacific Railroad (Sess. Acts 1849, p. 222, § 14) the respective counties in which the railroad should be located were authorized to subscribe for the stock of the company and invest the funds of the county therein. The stock was to be held, owned and treated as county property, and the stock subscribed by each county belonged to and is owned by the county, unless its title has been divested by acts and transactions subsequent to the original subscription.

2. *Pacific Railroad — County subscriptions — Special taxes — Construction of statute.*— Section 30 of the act of February, 1853, authorizing the formation

of railroad associations (Sess. Acts 1853, p. 121), has in view subscriptions made after the passage of said act—not subscriptions made prior thereto. Section 33 of that act, which authorizes the levy of a special tax to pay the interest on bonds theretofore issued, and provide a sinking fund to pay the principal, grants no stock rights to individual tax-payers. The stock subscribed prior to the passage of this act, under the authority of section 14 of the act of 1849 (Sess. Acts 1849, p. 222), belonged to the county subscribing it and contracting to pay for it, notwithstanding it may have been paid for by the proceeds of special taxes levied under section 33 of the act of 1853, above quoted.

*Appeal from St. Louis Circuit Court.*

*Nickerson* and *Leighton*, for appellants.

The act to incorporate the Pacific Railroad, approved March 12, 1849, did not give the County Court of Johnson county the power to levy a special tax to pay the bonds issued by the court to pay its subscription of $100,000, made September 13, 1851, or to pay the $50,000 which was subscribed on the 12th day of November, 1853. Section 14 of the above act, which is supposed to confer the power, merely gives the County Court the power to invest the funds of the county in the stock of the company. Section 14 also provides for the issuing of bonds of such county to raise funds to pay for the stock thus described; but nowhere in the section, or in the whole act, is the power given to levy a special tax to pay either of the subscriptions. The mere existence of the act of 1853 shows that it was a remedial act passed to confer the power on the County Court to levy a special tax in order to meet the installments coming due on subscriptions which the several County Courts had made prior to the passage of the act of 1853 (Sess. Acts 1853, p. 121, § 33). Nothing was done under the act of 1849; everything was done under the act of 1853. No step was taken to levy a special tax until 1854, and the bonds for the $100,000 were not issued until January, 1857; and they bear upon their face the words " to be paid by special tax, according to the rate of tax-payers of Johnson county." Section 30 of the act of 1853 makes provision not only for all future subscriptions to be made and paid for, but also all subscriptions " heretofore made"— that is, made under the former

law — to the capital stock of any railroad, and provides for the levy of a special tax to pay the principal and interest on the bonds issued by the court to pay such subscription; and the conclusion is that, when so paid by special tax, the persons who pay the special tax shall become owners of the stock by complying with the provisions of the law (Sess. Acts 1853, p. 136, §§ 30, 31); that, under the act of incorporation of 1849, the County Court could only use the proceeds from the internal improvement fund, and swamp land and other funds of the county, to pay off the subscriptions made prior to the act of 1853. The act of 1853 was passed to empower the County Court by special tax to meet the installments due when its own funds failed (Sess. Acts 1853, p. 137, § 32); so that all the stock that was paid for out of the county's own funds would be owned by the county as a county, and all the stock paid for by the proceeds of the levy of the special tax would be held by the County Court, under the act of 1853, in trust for the persons paying the special tax. (Sess. Acts 1853, p. 136, § 31.)

*S. N. Holliday*, and *Sharp & Broadhead*, for respondent.

Section 14 of the act of March 12, 1849 (Sess. Acts 1849, p. 219), authorizes County Courts of counties through which the Pacific Railroad might be located, to subscribe to the stock of that company, and to invest the funds of the county in such stock; to issue bonds of the counties to raise funds to pay the stock subscribed, and take proper steps to protect the county's interest and credit, and appoint agents of the county to represent it, vote for it, and receive its dividends, etc. The act of March, 1849, is clear and not susceptible of misconstruction. It makes the county the owner of the stock subscribed for under it Whether that stock is paid for by funds of the county on hand, when it is purchased or raised afterward by taxation or by sale of the county bonds, or how the bonds are eventually paid, make no difference; the law only provides for the county being the stockholder, and no law looking to any other had any existence. The " act to authorize the formation of railroad associations and to regulate the same," approved February 24, 1853 (Sess. Acts

Ridings v. Hall et al.

1853, p. 121, §§ 29–32; *id.* 135–7), relates to and provides for subscriptions thereafter to be made by counties, etc. As to the Pacific Railroad and counties through which it was located, the law of 1849, under which the subscription was made, gave ample power. It made it a county debt, and the stock county property, to be paid for out of the treasury — out of its general funds — as any other county debt; no account kept of who paid the money into the treasury, except as in any other matter of taxation, and no idea of any individual owning the stock. This general law of 1853 for the first time looks to a special tax for subscriptions under it, constituting a separate fund from the general fund of the county, and provides that for subscriptions thereunder, and special taxes paid therefor, the tax-payers may get stock by getting transfers thereof from the county. After fully providing as to future subscriptions, the act provides that any county which had theretofore subscribed to the capital stock of any railroad, should be entitled to the privileges and subject to the liabilities of any other stockholder. Not a word is said of divesting the county of its title and giving it to a class of individuals who might pay as much as $100 of tax; but the title is expressly left in the county, where it was when and before that law was passed. The counties are to continue to have and hold their stock theretofore acquired and owned, and be subject to just the same liabilities and have just the rights of any other stockholder.

CURRIER, Judge, delivered the opinion of the court.

September 18, 1851, the county of Johnson subscribed for $100,000 of the stock of the Pacific Railroad, to be paid for according to the subscription contract, in six per cent. county bonds at ten, fifteen and twenty years. No bonds of that particular description were issued; but the County Court, in lieu of these, in December, 1865, issued to the railroad company seven per cent. county bonds, payable in equal installments in five, six, seven, eight and nine years.

By a subsequent arrangement between the county and the railroad, $47,000 of the bonds were surrendered to the county

for cancellation, and a corresponding amount of the stock subscription was released to the railroad, leaving but $53,000 of the stock to be issued, and a like amount of the bonds to be paid. These bonds have since been taken up and satisfied with the proceeds of special taxes levied and collected by the county for that purpose; receipts for the money paid in settlement of the taxes being issued to the tax-payers for the amounts paid by them respectively.

Notwithstanding the payment of the bonds, it appears that the stock has never been issued to the county, or to any one else, the railroad company being in doubt as to the title of the respective claimants.

The relator claims the stock in virtue of a purchase of it from the county, while the defendants, Hall and Jones, claim in virtue of tax receipts held by them. The real contest, therefore, is between the title of the county and the title of the tax-payers, the result depending upon the construction to be given to the different statutes which are supposed to have a bearing upon the question.

By the act incorporating the Pacific Railroad (Sess. Acts 1849, p. 222, § 14), the respective counties in which the railroad should be located were authorized to subscribe for the stock of the company, and to invest the funds of the county therein. The counties were also authorized to issue county bonds to raise funds to pay for the stock, and to take all proper steps to protect the interest and credit of the respective counties interested in the subject. The County Courts were also authorized to appoint agents to represent their respective counties, to vote upon the county stock, and collect the dividends thereon. In a word, the stock was to be held, owned and treated as county property. That is clearly what this section contemplates.

The Pacific Railroad was located in part in Johnson county, and the stock subscription above mentioned was made by the County Court under the authority of the fourteenth section of the act incorporating the company. The substance of that section has already been given. It is not claimed that this act contemplates the vesting of the title to stock in the tax-payers. The

stock, as already remarked, was to be county property; and the stock subscribed by Johnson county belonged to and is owned by that county, unless the county has become divested of title by acts and transactions subsequent to the original subscription.

It is nevertheless urged that the act incorporating the Pacific Railroad did not authorize Johnson county to levy a special tax for railroad objects, and that the stock taken by the county was paid through the medium of special taxation, as provided for in the act of February, 1853, authorizing the formation of railroad associations. (Sess. Acts 1853, p. 121.) It is thence argued that the title to the stock thus paid for should pass to and be vested in the tax-payers, according to the provisions of the thirty-first section of the act last referred to.

There would be force in this view if the taxes which were collected and applied in payment of the bonds issued for the stock had been raised under the authority of the thirtieth section of the act. But that does not appear to have been the fact. This section (§ 30) has in view stock subscriptions to be made after the passage of the act, and not subscriptions made prior thereto. It does not authorize the levy of special taxes to pay stock previously subscribed. It has no reference to past transactions, as is apparent upon the face of the section, and as is proved very conclusively by the provisions of the thirty-third section, where the power to tax on account of past subscriptions is expressly given. The section last referred to (§ 33) reads as follows:

"Any County Court which has *heretofore* subscribed to the capital stock of any railroad in this State shall be entitled to the privileges and subject to the liabilities of other stockholders in such company, and the County Court shall have all the rights and powers to provide funds to pay such subscriptions as are granted to County Courts by this act, *and may levy a special tax* to pay the interest on their bonds, or provide a sinking fund to pay the principal."

So far as this particular act is concerned, it is in this section that the authority is found for levying a special tax to meet the liabilities incurred by past subscriptions. The whole section

relates to county liabilities incurred prior to the passage of the act, and embraces the subscription of Johnson county made in 1851. The power to tax is express and ample, but no stock rights are granted to individual tax-payers. I think the stock subscribed prior to the passage of this act, under the authority of section 14 of the act of 1849, belonged to the county subscribing it and contracting to pay for it, notwithstanding the stock may have been paid by the proceeds of special taxes levied under section 33 of the act of 1853.

In regard to sections 29, 30, 31 and 32 of the act of 1853, this may be said: Section 29 provides for a popular election in regard to stock subscriptions made under authority of that act. But this has no bearing upon subscriptions made under the act of 1849. There the authority to subscribe was ample without the intervention of a popular election. Sections 30 and 31 provide for taxation for the purpose of raising money to pay for the stock authorized to be taken under section 29. It is in regard to such stock that section 31 grants to tax-payers certain property rights in the stock. The thirty-second section refers to the application and use of internal improvement funds and the contingent issue of bonds. These several sections are all prospective in their scope and operation, and do not affect past transactions.

My conclusion, therefore, is that these sections do not embrace the subscription made by Johnson county prior to the passage of the act, and consequently that the title to the stock so subscribed was not diverted from the county to the tax-payers, either by force of the sections themselves, or by anything shown to have been done in pursuance of them. These conclusions involve an affirmance of the judgment, since it is not questioned that the plaintiff has acquired by purchase the title of the county. The other judges concur.