## MASTIN v. THE PACIFIC RAILROAD COMPANY, *Appellant.*

1. **Railroad**: SUBSCRIPTION TO STOCK: STATUTE. It was competent for the legislature while authorizing the counties by the general railroad law of 1853 (Laws 1853, p. 121) to subscribe to the capital stock of railroads and to impose special taxes for the purpose of paying such subscription, to declare whether the stock subscribed for should belong to the county in its corporate capacity, or to the taxpayer.

2. ——: ——: ——. Nor would it have been incompetent for the legislature to give the stock in such case to the taxpayer, although the charter of the railroad to which the subscription was made was granted prior to the general railroad law of 1853, and such charter gave the absolute ownership of the stock subscribed by the county to the latter in its municipal character.

3. **Railroad**: COUNTY SUBSCRIPTION TO STOCK: QUESTION OF FACT. Whether a subscription by the county court of Jackson county of $200,000, made September 3, 1860, to the capital stock of the Pacific Railroad Company was made under the charter of the railroad, or under the general railroad law of the state then in force giving the stock to the taxpayer to the extent of the special taxes paid by him towards satisfaction of the subscription; *held* to be a question of fact to be determined from all the evidence bearing upon the acts and conduct of the parties to the subscription; also, *held* that the finding of the trial court that said subscription was made under the general railroad law was well supported by the evidence.

4. **Railroad**: STOCK, RIGHT TO: STATUTE. The taxpayer had the exclusive right to the stock due from the company under a subscription to its stock made under the general railroad law, and it could not be issued by the railroad to any one else.

*Appeal from Jackson Circuit Court.*—HON. SAMUEL L. SAWYER, Judge.

AFFIRMED.

*E. A. Andrews, James Baker* and *Thos. J. Portis* for appellant.

(1) The court below properly held: that the stock

subscribed by the county in 1853 (to-wit: $75,000) "was to· be held, owned and treated as county property." (2) The court below improperly held: that the stock subscribed by the county in 1860 (to-wit: $200,000) was held by the· county in trust and should be treated as the property of the taxpayer. (3) Section 14 of defendant's original charter, approved March 12, 1849 (acts 1849, p. 219), and the 13th section of the act amendatory thereof, approved December 25, 1852 (acts·1853, p. 10), authorized counties· to subscribe for its capital stock without ascertaining the sense of the voters as to the subscription or "as to· whether the same should be paid by issue of county bonds or by taxation," as was required by the general law in Revised Statutes, 1855, vol. 1, p. 427, sec. 30. (4) Said charter as amended authorized counties to issue· their bonds to pay such subscription, and as no limitation was imposed as to interest it was competent for the· parties to contract for any rate which the law did not. prohibit. Secs. 13 and 14, *supra*, and 56 Mo. 42. (5) When stock was subscribed by a county under said charter or its amendment, the stock so subscribed "was to be held, owned and treated as county property." 48 Mo. 104. (6) The plaintiff's title to stock subscribed by the county depends upon the law granting to the county court the power to subscribe. That the court did order· an election can make no difference. It was competent and proper for the court to consult the people before· making the subscription, but it was not bound to do so. In this case the court derived its power to subscribe from the law (charter) and not from the voters. 47 Mo. 349, 350. The charter and its amendments make no provision allowing the taxpayer stock. (7) To entitle a taxpayer to· stock under section 31 of the general law of 1853 (*idem* sec. 32, Revision 1855) there must have been prior to the subscription an affirmative vote by the taxpayers upon two propositions: *First* "for a subscription," and, *second*, to pay "by taxation." Section 29, General Law of 1853, *idem*, sec. 30, Revision of 1855. (8) It is only in such a case, that the county or municipal corporation may issue·

·anticipation bonds under section 33, (sec. 34) "bearing interest at a rate not exceeding 7 per cent. per annum." Sec. 33 General Law of 1853 ; *idem*, sec. 34, Revision of 1855 ; 56 Mo. 42, 44. (9) A subscription made under the general law, at the time the $200,000 was subscribed by Jackson county, to-wit: 1860, did not entitle a taxpayer to stock, if it was payable in bonds or out of the internal improvement funds, or from the proceeds of overflowed ·or swamp lands. Secs. 29, 31, ·and 32, General Law of 1853 ; *idem*, Revision of 1855, secs. 30, 32 and 33. (10) The subscription of $200,000 made by Jackson county in 1860, was not an original subscription under the general law, but a consolidation of the existing valid subscriptions of the county of $100,000, made in 1850 ; $50,000 by the city of Independence made in 1853, and $75,000 by the City of Kansas made in 1857, all under the provisions of defendant's charter, and a change to one more ·satisfactory to both parties to the contract, the contractee thereby surrendering its right to $25,000. The subscription when made, was by its terms made payable in bonds running four years or less and bearing ten per ·cent. interest, which were in 1865 again changed to six year bonds or less bearing the same rate of interest. (11) The defendant, at the time plaintiff demanded capital stock upon his tax certificates, had no stock to issue to either the county or taxpayers, having already issued to the county, one certificate of 750 shares, which was all that could be issued by it for the $75,000 subscription, made by the county in 1853 ; and, also, certificates for 2000 shares to taxpayers, which was all that could be issued by it for the $200,000 subscription made by the county in 1860. (12) Under the evidence, the plaintiff was not entitled to recover in this form of action on tax certificates issued for taxes to pay the $200,000 subscription, and the judgment should therefore be reversed.

*C. A. Winslow*, *F. M. Black* and *Edwin Silver* for ·respondent.

(1) The principal question in this case is as to whether the $200,000 subscribed by Jackson county to the capital stock of the Pacific Railroad belonged to the county or to the individuals who paid the special railroad taxes levied to pay that subscription; and the solution of this question depends, (a) upon the extent of the power of the legislature to make the provisions of the law of 1853, subsequently embodied in the revision of 1855, applicable to the charter of said railroad; and (b) whether the subscription was made, accepted and treated as subject to those provisions, which involves the construction of the various laws cited, and the consideration of the conduct of the county court and the railroad company in the premises. (2) Respondent maintains that the $200,000 subscription must be governed by the general law of 1853 as embodied in the revision of 1855, so far as relates to the right of the taxpayers to the stock in question, for two equally conclusive reasons: *First*. The subscription was made under that law and not under the charter. This is mainly a question of fact, it being assumed that the subscription could have been made under either law. *Savignac v. Garrison*, 18 How. 136. The lower court found this question of fact for respondent which should not be disturbed in the appellate court. *Gould v. Smith*, 48 Mo. 44. *Second*. If the subscription was in fact made under the charter, it would still be subject to the general law as to all subsequent matters, because that law was especially made applicable to the charter, the provisions in question here are not inconsistent with the charter, and the legislature was competent to enact them and apply them to the charter. The charter should be read as though sections 30 to 32, Laws 1853, p. 136, Revised Statutes 1855, sections 31 to 33, p. 427, were incorporated in it, or the provision of the charter substituted for section 29 of the general law, and then the whole matter will appear plain enough. No additional hardships are imposed on appellant; most of the provisions are highly beneficial,

and the power of the legislature to make them cannot be successfully questioned. They were all enacted before any subscription was made, and affect the remedy only. *Blair v. Perpetual Ins. Co.*, 10 Mo. 559; *Peters v. Railroad*, 23 Mo. 107; *Gorman v. Railroad*, 26 Mo. 441; *State v. Matthews*, 44 Mo. 523; *State v. H. & St. J. R. R. Co.*, 60 Mo. 143; *State ex rel. v. Garroutte*, 67 Mo. 445; *Com. v. Hamilton Mfg. Co.*, 120 Mass. 383; *Howard v. Kentucky Ins. Co.*, 13 B. Mon. 286; Morawetz on Corp., §§ 437 to 448; Field on Corp,, §§ 37 to 44; *State ex rel. Barlow v. Dallas County Court*, 72 Mo. 329. (3) The stock issued on the $200,000 subscription was the property of the persons who paid the special taxes and must be issued directly to them. The county had no agency or trusteeship in the premises. Laws 1853, p. 136, sec. 31; R. S. 1855, p. 428, sec. 32. (4) If the stock belonged to the individuals who paid the special taxes to pay the $200,000 subscription, and the company was bound to issue stock to the full amount thereof, on the proper presentation of the certificates, it follows that the plaintiff was entitled to have a certificate of stock for the full amount of the tax certificates held by him, as there remained unissued stock to more than the amount thereof. The answer claims that the defendant had complied with the law by issuing stock to taxpayers in the full amount of $200,000, but the evidence shows that defendant on the $200,000 subscription had only issued $169,600 to persons holding certificates for taxes levied to pay this subscription, the remaining $30,400 having been issued to persons holding certificates for taxes levied to pay the $75,000 subscription. Defendant had no right to issue stock to A which rightfully belonged to B, and having done so is no defence to this action. Plaintiff having presented his certificates in accordance with the law as it stood at the time, and the company having refused to issue the stock, he is entitled to recover its value on that day. G. S. 1865, p. 338, sec. 19; *State ex rel. v. Rombauer*, 46 Mo. 155; *Seymour v. Ives*, 46 Conn. 109.

ALEXANDER MARTIN, Special Judge.—This is an action for damages against the defendant on account of its refusal to issue and deliver to plaintiff certificates of its capital stock, and was commenced in August, 1873. It is alleged in the petition: that on the 12th day of September, 1853, Jackson county subscribed the sum of $75,000 to the capital stock of defendant, and that it paid said subscription by special taxes levied upon, and collected from, all taxable property for the years 1856, 1858 and 1859 ; that on the 3rd day of September, 1860, said county in pursuance of an election held to that end, subscribed a further sum of $200,000 to the capital stock of defendant, and that said subscription was paid by means of special taxes levied and collected from taxable property, for the years between 1861 and 1871 inclusive. It is further alleged that upon payment of said special taxes, the clerk of the county court issued and delivered, to the persons so paying, tax certificates declaring the amount paid by them respectively ; that by virtue of assignments to him, the plaintiff is owner of such certificates for taxes paid by taxpayers for the years 1856, 1858 and 1859, in the sum of $377.19, and for taxes paid for the years between 1861 and 1871 inclusive, in the sum of $11,193.39, amounting in the aggregate to a sum total of $11,570.50.

It is next averred, that upon presentation of these tax certificates to defendant, for the purpose of having them converted into shares of the defendant's capital stock, the defendant declined to recognize the right of plaintiff to such shares, and refused to transfer, issue, or deliver to him certificates of the same.

After some specific denials, the defendant in its answer, pleads affirmative matter, wherein it is alleged that, upon payment of said subscription of $75,000, the defendant issued, in fulfilment of its part of the obligation contained therein, a certificate of 750 shares of its capital stock, to the county of Jackson, being the full amount

called for in said subscription, and that, by virtue of an execution sale under a judgment against said county, said shares were sold and transferred to one John G. Priest, and entry to that effect made in the stock books of the company. In relation to the subscription of $200,000, it is alleged that the same was made and effected for the benefit of said county, and not for the use or benefit of the taxpayers, and that the county court having sold the stock represented by said subscription to divers persons, too numerous to mention, caused the defendant to issue certificates of stock to such persons, none of which ever came into the hands of plaintiff.

It is further alleged in the answer, that, notwithstanding the county owned the stock, the county court caused certificates to be issued to the persons paying special taxes for railroad purposes, which were presented to the company for the purpose of being converted into shares of capital stock, and upon which the company issued certificates of its stock to such persons in the full amount of $200,000, long prior to the date of the certificates sued on. The new matter of the answer is denied in the reply.

The issues thus raised by the pleadings were tried by the court without the intervention of a jury. It appears from the instructions, that the court ruled against the plaintiff on his demand under the subscription of $75,000, and in his favor on his demand under the subscription of $200,000. In accordance with this ruling, judgment was entered for plaintiff in the sum of $14,224, being the amount of his demand with interest on account of his tax certificates relating to the subscription of $200,000, from which the defendant appeals.

I. The right of the plaintiff to shares in the capital stock of defendant is a creation of the statute. Undoubtedly it was competent for the law-making power, while authorizing the counties to subscribe to the capital stock of railroads, and to impose special taxes for the purpose of paying such subscription, to declare whether the stock

subscribed for should belong to the county in its cor-
porate capacity or to the taxpayer, who eventually, in
every instance, bears the burden of the subscription.
No title to the shares in litigation is claimed or pre-
tended, outside of legislative enactments. In the charter
of defendant of February 17, 1849 (Sess. Acts 1849, p.
219), which was amended by act of December 25, 1852
(Sess. Acts 1852, p. 70), counties, cities and towns were
authorized to subscribe to its capital stock, without any
vote or advisory election of the taxpayers. They were
authorized to issue bonds in payment of its subscrip-
tions, or to make any other provision for payment
agreeable to the parties. No provision whatever is to be
found in the charter of defendant, or its amendments,
conferring upon taxpayers any title, either legal or
equitable, to the capital stock thus authorized to be sub-
scribed and paid for. In the 29th section of the general
railroad law of February 24, 1853 (Sess. Acts 1853,
p. 121, R. S. 1855, p. 427), the county court of any
county is authorized to subscribe to the capital stock of
any company organized under that law or any other act
of the state.

It is futher provided that such court may, for infor-
mation, cause an election to be held to ascertain the
sense of the taxpayers as to such subscription, and as to
whether the same should be paid by issue of bonds by
taxation. In the 30th section it is made the duty of the
court to issue bonds or levy a special tax to pay the
subscription, the funds raised by such tax to be kept
apart from other funds, and to be appropriated to no
other purpose than the payment of such subscription.
In the 31st section it is provided that the county court
shall cause to be issued and delivered to the persons pay-
ing such special taxes, certificates to that effect, which
shall be convertible into the stock of the company for
whose benefit the subscription was made. In the 32nd
section, the county is authorized to raise funds by issue
of bonds to pay the instalment of the subscription in

anticipation of the collection of the special railroad tax levied for that purpose. Under the 56th section, all existing railroad corporations are made subject to the provisions of the general law, in so far as they are not inconsistent with their charters. In pursuance of judicial construction the 29th section was so amended as to substitute "shall" for "may" with reference to the advisory election, thus making such election a condition precedent to a subscription by the county (Sess. Acts 1859-60, p. 88).

Thus, it will be seen that two distinct methods of subscription by counties and cities were apparently in force at the same time. By the method authorized in the charter of defendant, no advisory election was necessary, no particular form or process of payment is indicated and no right to the stock subscribed for is conferred upon the taxpayer. By the general law, an advisory election is necessary, payment by bonds or taxation is authorized, and a payment of special taxes, when properly certified, gives to the taxpayer a right in the capital stock of the company, corresponding with the amount paid by him.

II. While these two statutory modes of subscription were apparently both in force, Jackson county, on the 12th day of September, 1853, subscribed $75,000 to the capital stock of defendant, without ordering an advisory election, referring for its authority to do so to the charter of defendant, as amended by act of December 25th, 1852. The order for the subscription is silent as to the manner of payment, whether by money, bonds, or special taxation. The county court in 1856 levied a special tax supposed to be sufficient to pay the first one-third of the subscription, and in August, 1858, another tax to meet the second third. While matters so stood in this condition, the county court, on the 21st of December, 1858, ordered an election to be held on the second Monday of February, 1859, for the purpose of taking the sense of the taxpayers as to whether the county

should subscribe $200,000 to the capital stock of defendant, to be paid by taxation in four annual instalments, the proceeds of said taxation to be anticipated by the issue of bonds at the option of defendant. The conditions of the subscription were declared and published in the order for the election, one of which was that three former subscriptions, one of $100,000 in 1850 by the county, one of $50,000 in 1853 by the city of Independence, and one of $75,000 in 1857 by Kansas City, should be released and canceled. Nothing had ever been paid upon these subscriptions, no steps having ever been taken to that end ; and for these reasons they cannot.be considered in any other light than as inducements leading to the proposed subscription. In pursuance of this order, the advisory election was held and resulted in favor of the subscription.

No express reference appears in the order or in the proposition voted upon to the charter of the company or to the general railroad law, to indicate under which of them the county considered itself as acting. The omission of any such reference leaves the question to be settled by judicial determination, and gives rise to the principal point in controversy in this case, the plaintiff contending that the subscription was made under the general railroad law, while the defendant maintains that it was made under the charter of the company. On the 3rd of September, 1860, subscription was made by the agent of the county, in pursuance of the terms of the proposition carried at the election, and the conditions and terms so settled, were all formally accepted by the defendant in the contract of subscription. For the purpose of paying this subscription of $200,000 special taxes were levied in the years between 1861 and 1871, inclusive, and anticipation bonds were issued to meet the instalment of the subscription, while the tax was being collected.

III.  Returning now to the subscription of $75,000, let us consider what was done towards its payment and

discharge. It seems that on the 21st day of December, 1858, the same day on which the advisory election was ordered for the subscription of $200,000, the county court entered an order, authorizing the clerk to issue certificates of payment of railroad taxes to all persons who had paid taxes, declaring in said order, that said certificates entitled the owners thereof to shares in the capital stock of the company, at the rate of one share to every one hundred dollars represented in certificates. This order was modified by subsequent orders in 1868 and 1869, confirming and continuing the taxpayer's right to stock by virtue of his tax certificates and removing all restriction against the company issuing certificates of stock in satisfaction thereof to the taxpayers in person. Now at the date of this original order in 1858, no levy had been made or taxes collected except toward payment of the subscription of $75,000. The subscription of $200,000 was not effected till September 3, 1860, before which time the county had made levy, in 1859, to pay the remaining third of the subscription of $75,000. Consequently this order could, in its origin, have operated only upon the taxpayers discharging the subscription of $75,000. It recognized in them the right to convert their tax receipts into stock, and as we have seen, there was no foundation for this right except in the general railroad law. It is evident that the order was made in pursuance of the railroad laws, and under the impression that such law, modifying the charter of defendant, conferred upon taxpayers discharging subscriptions made professedly under the charter, the same rights to capital stock which they would be entitled to, if they had been made professedly under the general law. It is only upon this assumption any point or meaning can be attributed to the order. The county clerk, under this order, went on issuing tax certificates to persons paying the three levies made to discharge the subscription of $75,000. Of these certificates the plaintiff holds a small number aggregating $377.19.

The railroad company, commencing in the fall of 1868, issued certificates of stock to a large number of taxpayers presenting these tax certificates; none were issued, however, to the holders of the plaintiff's certificates. The taxes realized from the three levies not being sufficient to pay the whole subscription, the balance unpaid thereon remained till 1868, when the county, out of other funds, paid the same, amounting to $7,000. Immediately upon this payment the defendant issued to the county the full amount of stock called for in the subscription amounting to 750 shares. In the certificates so issued and delivered, the rights of taxpayers therein were ignored, and the county received them as belonging to itself in its corporate capacity. These shares were by execution sale, under a judgment against the county, taken from it, and vested in John G. Priest, on the 6th of March, 1869, as recited in the answer. Whether the taxpayer of this subscription was entitled, by virtue of his payment, to an interest in the capital stock of defendant, depends upon the construction placed upon the provisions of the general law, as bearing upon and modifying the rights and privileges flowing from the defendant's charter, and the acts amendatory thereof. It is unnecessary for us to decide the issue raised in respect to these tax certificates for the reason that the court held adversely to the plaintiff's claim thereunder, and he has not seen fit to appeal from such judgment.

In passing I will only venture the remark that, while the right given in defendant's charter to counties and cities to subscribe and pay for its capital stock, may well be regarded as a valuable property privilege possessed by defendant, I do not conceive that it is a privilege exempt from any subsequent legislation which leaves it unimpaired as to its beneficial results to the company. If the charter gave the absolute ownership of the stock subscribed by the county to the county, in its municipal character, and the general law modifying the charter gave it to the taxpayers eventually bearing the

burden of the subscription, I am at a loss to perceive how the supposed privilege or franchise of defendant is materially impaired by the change. Whether the stock subscribed for shall vest in the county in its corporate capacity, or go to the taxpayers, as the beneficiary, is a matter of no consequence to the defendant. In either case the defendant parts with the same amount of stock for the subscription. No burdens are added, and no contracts impaired, to its detriment. The county might have some grounds of objection to the change, if it was only a private corporation. But as an arm of the civil government, its rights and privileges are always subject to modification and changes for the public good. Reference is here intended to the prospective operation of the general act, this court having decided that a subscription made anterior to its passage is not governed by its provisions. *Ridings v. Hall*, 48 Mo. 100.

IV. The controlling question of the case, as already intimated, relates to the subscription of $200,000, and is, whether said subscription was made under and in pursuance of the general railroad law, and thereby became subject to its provisions, in respect to the ownership of the stock subscribed for. The provision of that law, as we have seen, gave such stock to the taxpayer to the extent of the special taxes paid by him towards satisfaction of the subscription. This, it seems to me, is a question of fact to be determined from all the evidence bearing upon the acts and conduct of the parties to the subscription. The court below held that it was made under and in pursuance of the general law, and I am of the opinion that its finding is well supported by the evidence. It seems to me that all the material and prominent features of the transaction lead to this conclusion.

The general law required an advisory election, as a condition precedent to the subscription, and an advisory election such as called for in the law, was held, in pursuance of an order of the county court. The law made it

the duty of the county to pay the subscription by issue
of bonds or by taxation. It was determined by the ad-
visory election and in the contract of subscription, that the
subscription should be paid by taxation. That law autho-
rized the issue of anticipation bonds to meet the instal-
ments of the subscription, while the special tax was being
collected. Such anticipation bonds were issued and were
delivered to the company, for the use of the contractors
as the construction of the road progressed. The cancel-
lation of the subscriptions of Independence and Kansas
City, and the undertaking of the company, as con-
tained in the fifth clause of the proposition voted upon,
not to accept any subscriptions from said cities by which
they should be released from any part of the $200,000
subscription, derived their origin from the general law;
for it is only by virtue of that law, that cities could
claim exemption from the tax to pay county subscrip-
tions to the extent of the city subscriptions to the same
road. Indeed the conduct of the parties to the contract
of subscription in the issue of tax certificates convertible
into stock to the holders thereof, when presented, indi-
cates very plainly that they both considered themselves
as acting under the general law.

The only apparent departure from the general act
consists in making the anticipation bonds bear ten,
instead of seven, per cent. interest. But this is an
insignificant fact in its weight against the accumulation
of evidence, pointing to the general law as the guide and
authority of both parties in the transaction. The objec-
tion that the vote taken at the advisory election was not
in conformity with the general law is not well founded.
The law does not prescribe any particular form of ballot.
It requires that an election shall be held "to ascertain
the sense of the taxpayers of such county or such city
as to such subscription, and as to whether the same shall
be paid by issues of county or city bonds, as the case
may be, or by taxation." The ballots cast were headed
"for the subscription," or "against the subscription."

The propositions of subscription submitted to the tax-payers contained both the fact of subscription of $200,000 and the method of payment by taxation, with the privilege of anticipating the collection of the taxes by issue of bonds for that purpose, so that a vote "for the subscription" was necessarily a vote for the proposed method of payment, and must have been so understood by the voters. A taxpayer, opposed to either the fact of a subscription, or the proposed method of payment, indicated his action in the matter by voting the other ballot. Perhaps the ballot made use of was not the best which could have been employed to obtain a fair expression of the taxpayer's judgment on the propositions submitted to him for decision; but this is a trifling consideration in determining the question as to whether the election was actually and substantially held in pursuance of the general law.

In the final order of the court making the subscription, it is recited that the advisory election had been "duly held," and that it was by a large majority of the voters advised to make the subscription proposed in said election. The terms of the subscription are all recited in this order, a certified copy of which was furnished to the company; and the company thereupon filed its written acceptance of the subscription and conditions expressed in the order, thereby waiving any objection it might have to the regularity of the election. After having received the full amount of the subscription by means of taxation, which was borne by the taxpayers upon the faith of a regular election, held in pursuance of the general law, which gave them right to capital stock corresponding with the amounts paid by them respectively, it is too late for the company to object to the regularity of the advisory election and deny their claims for stock.

The anticipation bonds, mentioned in the general act, are not like those provided for in the absence of special taxation, and which were to go in absolute pay-

ment of the subscription. According to my understanding of them, they constituted only a provisional payment of the subscription, which was not to be regarded as paid until they themselves were paid out of the special fund raised by taxation. To the extent of the bonds received by the company, it became interested in the special fund raised by taxation, which the county had no power to appropriate to any other purpose than payment of the subscription, by payment of the anticipation bonds. They did not constitute payment of the subscription any more than a person's note constitutes a payment of his debt. They were accepted by the company on account of the subscription, and were furnished to the contractors as the road was built, but it does not appear that the company issued to the county any stock upon receipt of them. Its certificates of stock were not issued till after payment of the bonds by the taxes collected, and then only to the amount of the taxes paid into the special tax fund. Thus it appears that the subscription was paid by means of the special tax, because the provisional bonds taken by the company on account of it, were paid from the special tax fund.

V. Holding, as we must, that the subscription of $200,000 was made in pursuance of the general railroad law, and that the rights of all parties interested therein must be governed by the provisions of that law, I apprehend there can be no serious doubt about the taxpayer's exclusive right to the stock due from the company under said subscription. It is true that the subscription stands in the name of the county; and that upon the county is enjoined the duty of making levies of taxation, collecting said taxes, and keeping them apart in a separate fund for the purpose of paying the subscription. Duties of trust and guardianship are imposed upon the county from the performance of which the taxpayer's right to the stock finally emerges perfect and complete in the form of a tax certificate. The law provides that the county court "shall cause to be issued and delivered to the

person paying such special tax a certificate of the amounts thereof paid," on which, when presented, "the company shall issue a certificate of stock to the person entitled thereto, or to his legal representatives." After receipt of the tax certificate the taxpayer's rights seem to be emancipated from the preceding trust and guardianship of the county, and he is enabled to deal with the company in his individual capacity. The duty of dealing with him in that capacity is imposed upon the company. The shares of stock due him by virtue of his tax certificate can be issued to no one else.

The plaintiff, as holder of tax certificates in the sum of $11,193.39, for taxes paid in discharge of the subscription of $200,000, has demanded the certificates of stock into which they are convertible by law. The defendant has refused to honor this demand, and in excuse of its action in so doing, contends that it has issued and delivered the full amount of stock due from it on account of said subscription. It is not pretended in the evidence that the shares called for in these tax certificates have ever been issued to the plaintiff or his assignor, or any one acting for them, or either of them. This fact of itself should end the controversy and authorize a judgment in his favor.

The embarassment which attends the attitude of defendant, I will briefly notice. It appears from the evidence that the company, commencing in the fall of 1868, went on issuing certificates of stock to taxpayers, as their tax certificates were presented. In doing so it issued shares of stock to taxpayers under both subscriptions indiscriminately. It seems that, in this manner, it issued certificates of stock upon tax certificates for the years 1856, 1858 and 1859, in the sum of $30,400. These shares so issued were necessarily in answer to the subscription of $75,000, for which alone the taxes for those years were collected. It issued to taxpayers certificates of stock in the sum of $169,600 in answer to certificates of tax payments of special taxes for years subsequent

to 1859, and consequently in discharge of its obligation under the subscription of $200,000. This leaves a balance of $30,400 of outstanding tax certificates under that subscription, which have never been converted into stock, of which the plaintiff holds an amount presented by him in the sum of $11,193.39. It thus appears from the evidence that the company has parted with the full number of shares called for by the two subscriptions, viz: 750 shares and 2,000 (304-1,696) shares, a fact which it pleads in satisfaction of the demands under both subscriptions. But in making out the full amount of stock called for in both subscriptions, the company is compelled to count a double issue of 304 shares under the subscription of $75,000, viz: an issue of 750 shares therefor to the county, which was taken on execution and never went to any taxpayers, and an issue of 304 shares to the taxpayers helping to discharge such subscription. Whether the shares subscribed for in that subscription belonged to the county or to the taxpayers discharging it, is a matter of no consequence to the plaintiff whose tax certificates relate to the other subscription of $200,000. It is no defence against his demand, that the stock called for in his tax certificates has been issued to any one else. The plaintiff had nothing to do with the mistake of this double issue of stock. It is the defendant's mistake and cannot be maintained in satisfaction of the plaintiff's demand.

In pursuance of these views the judgment should be affirmed. Henry, C. J., Ray and Sherwood, JJ., and Geo. A. Madill, special judge, concur, Norton and Hough, JJ., not sitting.